EDMUND A. SARGUS, JR., CHIEF UNITED STATES DISTRICT JUDGE
This matter is before the Court on Plaintiff's Motion for the Partial Exclusion of Opinions and Testimony of Defendant's Experts Related to General Causation ("Motion Regarding General Causation") (ECF No. 4322), Plaintiff's Motion for Partial Exclusion *683 of Opinions and Testimony of Defendant's Experts Related to Specific Causation ("Motion Regarding Specific Causation") (ECF No. 4323), Defendant's Memorandum in Opposition to Plaintiff's Motions (ECF No. 4336), and Plaintiff's Replies in Support of his Motions (ECF Nos. 4342, 4343). For the reasons that follow, the Court GRANTS IN PART AND DENIES IN PART Plaintiff's Motions.
I.
Plaintiff David Freeman's trial is scheduled for May 31, 2016, as the second bellwether trial of the over 3500 cases that make up this multidistrict litigation ("MDL"). The Judicial Panel on Multidistrict Litigation describes the cases in its Transfer Order as follows:
All the actions are personal injury or wrongful death actions arising out of plaintiffs' alleged ingestion of drinking water contaminated with a chemical, C-8 (also known as perfluorooctoanoic acid (PFOA) or ammonium perfluorooctanoate (APFO) ), discharged from [Defendant E. I. du Pont de Nemours and Company's ("DuPont") ] Washington Works Plant near Parkersburg, West Virginia. All of the plaintiffs in this litigation allege that they suffer or suffered from one or more of six diseases identified as potentially linked to C-8 exposure by a study conducted as part of a 2005 settlement ["Leach Settlement Agreement" or "Contract"] between DuPont and a class of approximately 80,000 persons residing in six water districts allegedly contaminated by C-8 from the Washington Works Plant. See Leach v. E. I. Du Pont de Nemours & Co. , No. 01-C-608 (W. Va. Cir. Ct. [ (Wood County Aug. 31, 2001), ("Leach Case") ].
(Transfer Order at 1, ECF No. 1.) DuPont utilized C-8 as a manufacturing aid in the production of Teflon™.
A. The Leach Case
As indicated by the Judicial Panel in its Transfer Order, the cases that make up this MDL are a subset of cases that originated in the Leach Case. The Leach Case was brought by a group of individuals who alleged a variety of claims under West Virginia common law tort theories for equitable, injunctive, and declaratory relief, along with compensatory and punitive damages, as a result of alleged drinking water contamination. In the Leach Settlement Agreement, the parties fashioned a unique procedure to determine whether the approximately 80,000 members of the class ("Leach Class") would be permitted to file actions against DuPont based on any of the human diseases they believed had been caused by their exposure to C-8 discharged from DuPont's Washington Works plant. (Leach Settlement Agreement ("S.A."), ECF No. 820-8.)
The procedure required DuPont and the representatives of the Leach Class to jointly select three completely independent, mutually-agreeable, appropriately credentialed, epidemiologists ("Science Panel") to study whether there is a connection between C-8 and human disease among the Leach Class. (S.A. at §§ 12.2.1, 12.2.2.) Pursuant to the agreed procedure the parties set forth in the Leach Settlement Agreement, the Science Panel established protocols and studied C-8's connection to numerous human diseases among the Leach Class, examining health data and blood samples from approximately 69,000 individuals exposed to C-8 in the communities served by the water districts whose water had been contaminated with C-8 released from DuPont's Washington Works plant. (http://www.c8sciencepanel.org/c8health.html ) ("The Science Panel, as part *684 of the Community Study, received the anonymised and non-identifiable health data collected by Brookmar [in the C-8 Health Project] to examine and analyze as part of its work."). DuPont paid the entire cost of the study which was more than $20 million dollars. (S.A. § 9.1.)
The Leach Settlement Agreement provided that the conclusions of the Science Panel's study would be issued in either a "Probable Link Finding" or a "No Probable Link Finding" for each human disease the Panel studied. (S.A. § 12.2.3.) "[T]he Probable Link reports [are] presented in detail in scientific articles (follow link [on the C-8 Science Panel website to the] Study Publications." (http://www.c8sciencepanel.org/study.html.)
The Science Panel engaged in its work for seven years and in 2011 and 2012 issued Probable Link Findings for six human diseases, including testicular cancer, ("Linked Diseases") and No Probable Link Findings for over forty human diseases. The Leach Settlement Agreement defines "Probable Link" as follows:
"Probable Link" shall mean that based upon the weight of the available scientific evidence, it is more likely than not that there is a link between exposure to C-8 and a particular Human Disease among Class Members.
(S.A. § 1.49.)
Because the Science Panel delivered Probable Link Findings for the six Linked Diseases, the Leach Settlement Agreement permits the individual class members to pursue their claims "for personal injury and wrongful death, including but not limited to any claims for injunctive relief and special, general and punitive and any other damages whatsoever associated with such claims, that ... relate to exposure to C-8 of Class Members" and DuPont agreed not to contest general causation in those actions . (S.A. § 3.3.) DuPont retained the right to contest specific causation and to assert any other defenses not barred by the Leach Settlement Agreement. (S.A. § 3.3.)
The parties defined general and specific causation as follows:
"General Causation" shall mean that it is probable that exposure to C-8 is capable of causing a particular Human Disease.
....
"Specific Causation" shall mean that it is probable that exposure to C-8 caused a particular Human Disease in a specific individual.
(S.A. §§ 1.25, 1.60.)
After the Science Panel delivered its Findings, the members of the Leach class whose claims are based on any disease for which a No Probable Link Finding was issued were forever barred from bringing their suits against DuPont. (S.A. § 3.3.) The individuals who suffered from one or more of the Linked Diseases began to file cases in West Virginia and Ohio. DuPont moved the United States Judicial Panel on Multidistrict Litigation for centralization of these individual actions pursuant to 28 U.S.C. § 1407.
The Judicial Panel granted DuPont's request and on April 9, 2013, it transferred the centralized action to this Court. Ultimately, 3,542 cases were filed in or transferred to this Court as part of this MDL. Through a negotiated process, the parties chose, and this Court approved, five plaintiffs whose cases would serve as bellwether trials. The first bellwether plaintiff, Carla Marie Bartlett, tried her case to a jury in September 2015. The second bellwether case was resolved. Mr. Freeman was chosen as the third bellwether case, and will be the second case to go to a jury trial.
B. Mr. Freeman's Case
Mr. Freeman has lived in Cutler, Ohio, since 1993. The water to his residence was *685 supplied from the Little Hocking water district, a named district in the Leach Settlement Agreement. In March 2000, when Mr. Freeman was forty years old, he felt pain in his right testis when he bumped it while taking a shower. Upon self-examination, he found what he described as a "hard testicle which turned out to have a mass inside." (Freeman Dep. at 224-25, ECF No. 4312-4.) After consulting his primary care physician, who referred him to a urologic surgeon, "he underwent a right radical orchiectomy (inguinal approach)," on April 5, 2000. (Bahnson Report at 3, ECF No. 4311-1.) Pathology revealed that his "right testicular tumor was a teratoma with both mature and immature elements: i.e. , a malignancy. Additionally, peripheral to the tumor were some seminiferous tabules demonstrating intratubular germ cell neoplasia of the unclassified type," Id. at 4. Oncologist Kelli Cawley, M.D., diagnosed Mr. Freeman "with cancer of the testis and, more specifically, teratoma with immature and mature components." Id. at 3-4. "After the surgical extraction of his right testis and teratoma, Mr. Freeman underwent a ten-year follow-up protocol which involved frequent observation via x-rays, CAT scans, and tumor markers." Id. at 4.
To meet his burden of proving his claim that C-8 caused his testicular cancer, Mr. Freeman has proffered the expert opinion of Robert Bahnson, M.D., F.A.C.S. Dr. Bahnson is a licensed medical doctor, a surgeon, and a Board Certified urologist, a field of medical specialization in diseases of the urinary tract and the male reproductive system, who has been practicing medicine for over thirty years. Dr. Bahnson is a Professor in the Department of Urology at The Ohio State University Wexner Medical Center, which is part of The Ohio State University Comprehensive Cancer Center. He practices at the Arthur G. James Cancer Hospital and Richard J. Solove Research Institute, where he was recently the Chief of Staff. He has authored or co-authored over one-hundred peer-reviewed articles, reviews, and book chapters, many of which focus on different aspects or urologic oncology, which includes cancer of the prostate, bladder, kidney, and testicular cancer. There is no dispute that Dr. Bahnson is qualified to give an expert opinion as to the specific cause of Mr. Freeman's testicular cancer and/or his potential for future cancer. Dr. Bahnson opined that:
David Freeman's exposure to C-8 in his drinking water was a substantial contributing factor in bringing about the development of his testicular cancer, Further, his cancer in the right testis now puts him at substantial risk (approximately 15% chance) for developing cancer in the left testis. Additionally, because Mr. Freemam underwent (appropriately so) frequent repeated CT scanning as part of his 10 year observation protocol, his risk for developing other cancers has also increased.
Id. at 7. Dr. Bahnson holds that opinion to a reasonable degree of medical certainty.
DuPont offers the expert testimony of Douglas L. Weed, M.D., M.P.H., Ph.D, (Weed Report, ECF No. 2807-9;); Robert W. Rickard, Ph.D, D.A.B.T. (Rickard Report, ECF No. 4310-2), Tony Luongo, M.D. (Luongo Report, ECF No. 4310-1; Luongo Dep., ECF No. 4308-2), FRCSC, F.A.C.S., and Mark Schoenberg, M.D. (Schoenberg Report, ECF No. 4310-3; Schoenberg Dep., ECF No. 4308-1). Mr. Freeman moves for partial exclusion of those opinions.
II.
In Daubert v. Merrell Dow Pharmaceuticals, Incorporated , 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the United States Supreme Court held that the Federal Rules of Evidence, in particular *686 Rules 702 and 104(a), govern the admission of expert witness testimony and require that the trial judge "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Id. at 589, 113 S.Ct. 2786. Because Rule 702 "requires that the evidence or testimony 'assist the trier of fact to understand the evidence,' " expert testimony "which does not relate to any issue in the case is not relevant and ergo, nonhelpful." Id. at 590-90, 113 S.Ct. 2786. "In other words, there must be a 'fit' between the proposed testimony and the question(s) presented by the case at bar." Id. at 591, 113 S.Ct. 2786.
The burden is on the party proffering the expert report to demonstrate by a preponderance of proof that the opinions of their experts are admissible. Nelson v. Tenn. Gas Pipeline Co. , 243 F.3d 244, 251 (6th Cir. 2001). A district court exercises its responsibility in acting as the "gatekeeper" for expert testimony. Daubert , 509 U.S. at 588, 113 S.Ct. 2786 ; Kumho Tire Co. v. Carmichael , 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). This role, however, is not intended to supplant the adversary system or the role of the jury. In re Scrap Metal Antitrust Litig. , 527 F.3d 517, 531-32 (6th Cir. 2008). Arguments regarding the weight to be given any testimony or opinions of an expert witness are properly left to the jury. Id. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Id. (quoting Daubert , 509 U.S. at 596, 113 S.Ct. 2786 ).
To determine whether expert testimony is "reliable," the court's role, and the offering party's responsibility, "is to make certain that an expert ... employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co. v. Carmichael , 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Generally, the expert's opinions must reflect "scientific knowledge ... derived by the scientific method," representing "good science." Daubert , 509 U.S. at 590, 593, 113 S.Ct. 2786. The test of reliability is, however, a "flexible" one. Kumho Tire Co. , 526 U.S. at 140, 119 S.Ct. 1167. Any doubts regarding the admissibility of an expert's testimony should be resolved in favor of admissibility. Fed. R. Evid. 702 Advisory Committee's Notes ("[A] review of the case law... shows that rejection of the expert testimony is the exception rather than the rule."); Jahn v. Equine Services, PSC , 233 F.3d 382, 388 (6th Cir. 2000) (stating that in Daubert "[t]he Court explained that Rule 702 displays a liberal thrust with the general approach of relaxing the traditional barriers to opinion testimony") (internal quotations omitted).
III.
Mr. Freeman divides his requests for exclusion of DuPont's proffered expert testimony and opinions into two motions: one directed at general causation and one focused on specific causation.
A. General Causation
In his Motion Regarding General Causation, Mr. Freeman
moves to partially exclude the opinions and testimony of defense expert witnesses Dr. Douglas Weed, Dr. Robert Rickard, Dr. Tony Luongo, and Dr. Mark Schoenberg, on the basis that such opinions fail to meet the requirements for admissibility pursuant to Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharms. , 509 U.S. 579 [113 S.Ct. 2786, 125 L.Ed.2d 469] (1993), consistent with this *687 Court's prior Orders, including but not limited to, Evidentiary Motions Order 1 [ECF No. 4079], Evidentiary Motions Order No. 1-A [ECF No. 4226], and Dispositive Motions Order No. 12 [ECF No. 4306],
(Pl's Mot. Regarding Gen. Causation at 1.)
In opposition, DuPont explains that "many of the expert opinions that Plaintiff complains about in his Daubert Motions were made for the record for preservation purposes" not for the purpose of submission in Mr. Freeman's trial. (Def.'s Mem. in Opp. at 5.) DuPont "has made clear" that "it has no intention of disregarding this Court's prior orders at trial." Id. at 7. DuPont confirms that it has "no current intention of eliciting" certain of the challenged opinions at issue in the context of Mr. Freeman's case, "unless Plaintiff opens the door and this Court allows," because "of the Court's prior rulings," including any "opinions from its experts at trial that dispute this Court's rulings on general causation or get into all of the details of the Science Panel's reports." Id. at 5-7.
Mr. Freeman's reply reflects that the parties are in agreement on many of the opinions and much of the testimony to which Mr. Freeman directs his Motion Regarding General Causation. The reply narrows the focus of the disputes to the following: (1) DuPont's use of the term "current intention," which Mr. Freeman suggests shows that DuPont may change its mind about contesting application of the Leach Settlement Agreement or this Court's prior decisions at the Freeman trial; and (2) clarifications and resolution of certain still challenged opinions and testimony.
1. "Current Intentions"
The parties and this Court are in agreement that the Leach Settlement Agreement and this Court's prior rulings (directed at "all actions") are applicable to Mr. Freeman's case. Mr. Freeman suggests, however, that DuPont's use of the adjective "current" indicates that at the writing of its memorandum in opposition it had no intention of contesting application of the Leach Settlement Agreement or this Court's prior decisions, but reserves the right to do so without notice at the Freeman trial. It does not appear to the Court that this is DuPont's intention. To be clear though, DuPont must make any changes to its current position that the Leach Settlement Agreement and this Court's prior decisions related to general causation via motion, and not without notice at trial. The Court has no reason to assume that DuPont would do otherwise.
2. Opinions Offered
The Court notes that, as DuPont stated in its opposition, many of the issues raised by Mr. Freeman were dealt with previously by this Court and DuPont intends to abide by those rulings. DuPont explains that it has elicited all four of these experts' testimony and/or opinions in what would otherwise be a violation of those prior orders only to make a record for appeal, which is certainly appropriate. Thus, the Court will not address any of those opinions or testimony.
a. Dr. Weed
DuPont maintains that the testimony it intends to offer from Dr. Weed is directed to "what DuPont knew or should have known about the developing state of the scientific knowledge on C-8 during the relevant years of DuPont's conduct prior to the Science Panel's reports in 2012." (Def.'s Mem. in Opp. at 16.) Mr. Freeman does not dispute that this testimony is admissible.
b. Dr. Rickard
DuPont contends that "Dr. Rickard's opinions are directly and highly relevant to key issues in dispute at the upcoming Freeman trial.... [such as] his *688 opinions about the developing state of the knowledge regarding C-8 at the relevant time of DuPont's conduct prior to the Science Panel's reports in 2012 [and] are in no way excluded by the Court's prior orders." (Def.'s Mem. in Opp. at 14.) Mr. Freeman does not dispute that any of Dr. Rickard's opinions related to the developing state of the knowledge regarding C-8 prior to 2012 are relevant. Yet, the parties do have some disagreement or misunderstanding about the following opinion highlighted by Mr. Freeman in his Motion Regarding General Causation:
1. "[T]here is no animal study that supports PFOA being able to cause testicular cancer at the exposure level claimed by Mr. Freeman. There is no established mechanism of action by which PFOA could cause testicular cancer at the exposure level claimed by Mr. Freeman." (New Rickard Report at 5; See also id. at 7-8.) Dr. Rickard provides over 15 pages of detailed analysis of the nuances and limitations of the toxicological and mode of action data on C8's ability to cause disease to "support" this opinion. (See [Rickard's New Report] at 10-26.)
(Pl.'s Mot. Regarding Gen. Causation at 11.)
Mr. Freeman expresses concern that, although the opinion "would appear to be encompassed within DuPont's concession that it will not offer any expert opinions or testimony disputing whether C-8 is capable of causing testicular cancer, and whether there is scientific proof that Plaintiff's specific exposure to C-8 as capable of causing his testis cancer.... DuPont does not mention or cite" to these opinions. (Pl.'s Reply in Support of Mot. Related to Gen. Causation at 4-5.) DuPont focuses on the last sentence of the cited section of Mr. Freeman's Motion, asserting that he "takes an absurd and unsupportable position in arguing that Dr. Rickard should be precluded from testifying about animal studies or providing a 'detailed analysis of the nuances and limitations of the toxicological and mode of action data.' See General Causation Motion at 11, ¶ 1." (Def.'s Mem. in Opp. at 14.)
The Court finds that the first two sentences of the above quoted opinion given by Dr. Rickard are clearly inadmissible as opinions that go to general causation. This Court has specifically excluded these (almost exact) statements in Evidentiary Motions Order Number 1 ("EMO 1"), explaining:
The expert reports at issue reflect DuPont's challenge to general causation on two levels. First, some experts opine that the epidemiological data is insufficient to show that C-8 is capable of causing either of the Trial Plaintiffs' Linked Diseases, and second, that the toxicological data is insufficient to show that C-8 is capable of causing either of the Trial Plaintiffs' Linked Diseases. The Court notes that, throughout the experts' opinions, they refer to their analysis as relating to specific causation, when in actuality the analysis is directed at what the parties defined in the Leach Settlement Agreement as general causation. The following opinions are excluded themselves and are examples of the types of opinions that will not be admitted.
The following opinions of Dr. Rickard:
With respect to specific causation, there is no [toxicology] study that supports PFOA being able to cause kidney cancer at the exposure level claimed by Mrs. Bartlett. Similarly, with respect to specific causation, there is no [toxicology] study that supports PFOA being able to cause ulcerative colitis at the exposure level claimed by Mr. Wolf. There is no established mechanism of action by which PFOA could cause kidney cancer at the exposure level claimed by *689 Mrs. Bartlett, or cause ulcerative colitis at the exposure level claimed by Mr. Wolf.
(Rickard Report at 5.)
(EMO 1 at 11.)
As to the last sentence of the cited section of Mr. Freeman's Motion, DuPont is correct that it contains an unsupportable position, if Mr. Freeman is attempting to claim exclusion of the entire 15 pages of analysis related to toxicological studies. As the parties understand, Dr. Rickard's testimony is admissible to show the "state of historic scientific knowledge," which is probative of whether DuPont should have foreseen prior to the Science Panel's report in 2012 that the release of C-8 from its Washington Works facility was likely to cause harm to community members, like Mr. Freeman. (Def.'s Mem. in Opp. at 15.) However, the Court notes that DuPont's "example" of this type of testimony is not admissible as offered. That is, DuPont states:
For example, in terms of the reasonableness of DuPont's conduct, and what was known by DuPont over the relevant years prior to the Science Panel's reports, Dr. Rickard reviewed the "state of the science over the years" as it relates to facts relevant to Plaintiff's case and noted, among other things, that:
"No germ cell testicular cancer, the type diagnosed in Mr. Freeman, was associated with [C-8] in the animal studies. A statistically significant increase in Leydig cell benign tumors of the testes was seen in male rats at a calculated blood level of 125,000 ppb. Spontaneous Leydig Cell Tumors (LCTs) are common in laboratory rats, and many chemicals including common drugs, refrigerants, pesticides, and sugars (e.g. lactose) produce LCTs when given to rats.
Id. at 8.
While DuPont contends that this opinion is directed at DuPont's conduct "over the relevant years prior to the Science Panel's reports," nowhere in the opinion is that noted. Nor can the Court determine that is what the opinion, and others in that 15 page section, are intended to mean. The opinion is only admissible if it is Dr. Rickard's assessment of the state of knowledge prior to the issuance of the Probable Link Finding in 2012. Otherwise this opinion is an attack on general causation, i.e. , that it is probable that exposure to C-8 is capable of causing a Linked Disease. (S.A. § 1.25.)
c. Dr. Luongo and Dr. Schoenberg
There are portions of Dr. Luongo's and Dr. Schoenberg's opinions and/or testimony that Mr. Freeman contends are related to general causation, and therefore should be excluded as violative of the Leach Settlement Agreement: (i) their testimony that testicular cancer is "an idiopathic disease," and, (ii) their testimony "that the Probable Link between Mr. Freeman's C-8 exposure and testicular cancer is [not] 'generally accepted,' 'credible,' or 'convincing'." (Pl.'s Reply in Support of Mot. to Exclude Gen. Causation Opinions at 8, 9.) DuPont responds that "Drs. Luongo and Schoenberg are not challenging this Court's general causation rulings." (Def.'s Mem. in Opp. at 26.) DuPont supports it arguments with the contention that (iii) "Drs. Luongo and Schoenberg considered C-8 as a potential causal factor for Plaintiff's testicular cancer.... (iv) [and their] opinions on the historical state of science prior to the Science Panel's Findings are admissible." Id. at 26, 29.
i. Testicular Cancer Classified as an "Idiopathic Disease"
Mr. Freeman takes issue with Dr. Luongo's and Dr. Schoenberg's statements that testicular cancer in general is an "idiopathic disease." Specifically, Mr. Freeman cites to Dr. Schoenberg's opinion that:
*690 "Human GCT [germ cell tumor testiscancer ] is an idiopathic disease." (Schoenberg Report at 4.) And as to Dr. Luongo, Mr. Freeman cites to his opinion: "As the cause of testis cancer in the vast majority of cases is unknown, it is considered an idiopathic disease." (Luongo Report at 2.)
DuPont responds that Mr. Freeman is impermissibly attempting to prevent DuPont's experts from informing the jury that the "cause of testicular cancer is unknown in the vast majority of cases." (Def.'s Mem. in Opp. at 19.) This proposition, DuPont continues, is not disputed even by Mr. Freeman's expert, Dr. Bahnson. Id. (citing Bahnson Dep. at 52, ECF No. 4312-2) (agreeing that the cause of testicular cancer is unknown in the "majority of men who get it").
Mr. Freeman disagrees with DuPont's assessment, contending that it is not "attempting to prevent DuPont's experts from indicating to the jury that the 'cause of testicular cancer is unknown in the vast majority of cases .' " (Pl.'s Reply in Support of Mot. to Exclude Gen. Causation Opinion at 8.) Mr. Freeman maintains:
To the contrary, and as stated explicitly in Mr. Freeman's Motion, Plaintiff is only seeking to preclude DuPont from telling the jury that "testicular cancer is an idiopathic disease" as a general concept, and as expressly stated in both Dr. Luongo's and Dr. Schoenberg's expert reports. (See e.g. , Mot. at 12-13.) This is because a disease is only "idiopathic" if it is one for which there are no known causes . (See e.g. , Depo. Tr. of Dr. Mark Schoenberg [ECF No. 4308-1] at 114:14-18 (DuPont's own expert, Dr. Schoenberg, concedes that "idiopathic means there is no known cause" of the disease).) In this case, DuPont is expressly prohibited under its Contract from contesting the fact that C-8 is a proven cause of testicular cancer for purposes of Mr. Freeman's case, making the disease not one that is "idiopathic," by definition, in the context of this litigation.
Thus, allowing any DuPont expert to tell the jury that testicular cancer is considered an "idiopathic disease" for purposes of analysis in this case would be allowing DuPont to provide inaccurate testimony and testimony that is inherently inconsistent with the terms of the parties' Contract. (See e.g. , [Dispositive Motions Order] DMO 1, DMO 1-A, EMO 1, DMO 12.) DuPont's experts should, therefore, be precluded from offering any opinion or testimony in Mr. Freeman's case that testicular cancer is "an idiopathic disease."
Id. at 8-9.
The Court first notes that Mr. Freeman is correct regarding the definition of idiopathic as a disease "for which there are no known causes." See Cambridge Dictionaries Online, www.dictionary.cambridge.org ("an idiopathic disease or medical condition has no known cause"); The Free Medical Dictionary, http://medical-dictionary, thefreedictionary.com/idiopathic (defining idiopathic disease as "one that exists without any connection with any known cause"); Dictionary.com, www.dictionary.com ("of unknown cause"). However, Mr. Freeman's statement "that C-8 is a proven cause of testicular cancer" is not exactly accurate. As this Court explained in Evidentiary Motions Order Number 4 ("EMO 4"):
[T]the phrasing regarding general causation and the Science Panel's Probable Link Finding is more nuanced than that used by Mr. Freeman. As guidance, the Court utilizes the statement objected to as an example. The more appropriate phrasing reflecting the Leach Settlement Agreement is that it is indisputable and uncontestable that C-8 is, in fact, capable of causing testicular cancer in the Leach Class members. And, no expert *691 can opine that C-8 is incapable of causing testicular cancer in a Leach Class member.
(EMO 4 at 28) (citing S.A. § 1.49: "it is more likely than not that there is a link between exposure to C-8 and [testicular cancer ] among Class Members"; (S.A. § 1.25) ("it is probable that exposure to C-8 is capable of causing" testicular cancer ) ).
Similarly, using Mr. Freeman's statement above as an example, the more appropriate wording is that DuPont is expressly prohibited under its Contract from contesting the fact that it is more likely than not that there is a link between Mr. Freeman's exposure to C-8 and his testicular cancer (or that it is probable that Mr. Freeman's exposure to C-8 is capable of causing his kidney cancer ), making the disease not one that is "idiopathic," by definition, in the context of this litigation.
That being said, it is inaccurate to state "that testicular cancer is an idiopathic disease"-in other words testicular cancer has no known cause. Indeed, the statement is prohibited under the Leach Settlement Agreement. An expert may not say that there is no known cause for testicular cancer, but instead may say that there is no known cause in the majority of cases. Neither expert may suggest that the entire class of testicular cancers is idiopathic, (i.e. , of unknown cause) because the cause is unknown in the majority of cases. The parties agreed to abide by the Science Panel's Finding, which concludes that in Leach Class members C-8 is in fact capable of causing testicular cancer.
Although DuPont does not argue that Dr. Luongo's and/or Dr. Schoenberg's inaccurate statements are ones that should be left to cross examination, the Court notes that in ordinary circumstances "[t]he question of whether [the expert's] opinion is accurate in light of his use of [certain] data goes to the weight of the evidence, not to its admissibility[.]" In re Scrap Metal Antitrust Litig. , 527 F.3d at 531-32. However, as this Court has previously stated, this MDL does not house garden-variety personal injury and wrongful death claims.
All of the cases that make up this MDL were birthed from the Leach Settlement Agreement, wherein representatives of the Leach Class and DuPont fashioned unique procedures that provide clear lines by which the Leach Class may, or may not, litigate their personal injury and wrongful death claims. DuPont and the Leach Class bound themselves by this Contract over a decade ago, which provides a distinct procedure to determine whether C-8 is capable of causing any of over fifty diseases suffered by the Leach Class. (EMO 1 at 7-8) ("The analysis of causation in the cases that make up this MDL is not the one commonly utilized in toxic tort case law. The causation inquiry is dictated by the unique procedure established in the contractual agreement between the parties that they set forth in the Leach Settlement Agreement."). The parties agreed that the Science Panel's Probable Link Findings and the No Probable Link Findings were applicable to every Leach Class member. Just as a Leach Class member with a non-linked disease may not challenge application of the No Probable Link Finding, DuPont cannot avoid application of the Probable Link Finding through the use of expert testimony. Therefore, this is not a situation where an expert may choose not to credit the Science Panel Finding that C-8 is capable of causing testicular cancer in Mr. Freeman, a Leach Class member.
ii. Contesting Probable Link Finding as Generally Accepted, Credible, or Convincing
Mr. Freeman asks for exclusion of any expert opinion or testimony "that the Probable Link between Mr. Freeman's C-8 exposure and testicular cancer is [not]
*692 'generally accepted,' 'credible,' or 'convincing'." (Pl.'s Reply in Support of Mot. to Exclude Gen. Causation Opinions at 8, 9.) Mr. Freeman highlights the opinion of Dr. Schoenberg, wherein he disputes Mr. Freeman's specific causation expert's statement that C-8 is "generally accepted" within the scientific community as a cause of testis cancer. This issue was addressed by the Court in its decision on Defendant's Motion to Exclude the Testimony of Trial Plaintiff David Freeman's Specific Causation Expert, Dr. Robert Bahnson:
In its Motion, DuPont raises an argument related to its understanding that Dr. Bahnson intends to opine that C-8 is "generally accepted" as a "cause" of testicular cancer. (DuPont's Mot. at 16-18.) DuPont acknowledges "that this issue may be moot based on a discussion between counsel during Dr. Bahnson's deposition." Id. at 2, n.1. Mr. Freeman responds that Dr. Bahnson does not intend to "proffer the opinion at trial that C-8 is generally accepted in the medical community as a cause of testicular cancer." (Pl.'s Mem. in Opp. at 20, n.10.) Thus, in reply DuPont states that it "now understands this specific issue to be moot, based on the agreement of Plaintiff's counsel not to offer any such evidence." (DuPont's Reply at 15.)
(EMO 4 at 27.)
Similarly, here DuPont maintains that Dr. Luongo's opinion that C-8 is not a "generally accepted" cause of testicular cancer"is merely a rebuttal to Dr. Bahnson" and "if Dr. Bahnson does not intend to bolster the Science Panel's findings by opining at trial that C-8 is a "generally accepted" cause of testicular cancer in the general medical and scientific literature, there will be no need for any of DuPont's experts to rebut that testimony." (Def.'s Mem. in Opp. at 33.) Consequently, the Court finds that the issue has been rendered moot by Mr. Freeman's declaration that he does not intend for Dr. Bahnson to offer the opinion that C-8 is a generally accepted cause of testicular cancer in the general medical and scientific literature.
Next, Mr. Freeman highlights Dr. Schoenberg's opinion and/or testimony that he contends disputes the Science Panel's Probable Link Finding. Dr. Schoenberg states that there is "no convincing evidence of a connection between the extensive list of examined [occupational and environmental] exposures and the development of testicular cancer" and no "credible link between the development of testis cancer and community environmental or occupational exposure to PFOA." (Pl.'s Mot. Regarding Gen. Causation at 13-14.)
DuPont responds as follows:
DuPont does not currently intend to elicit opinions from its experts at trial that dispute this Court's rulings on general causation or get into all of the details of the Science Panel's reports.... including questions regarding "aspects of the science panel report" and questions about whether under the general state of the science outside of the Science Panel reports there is a "credible link" between the development of testicular cancer and C-8 exposure, whether outside of the Science Panel reports C-8 is "capable of causing testicular cancer," and whether there is "scientific proof" that Plaintiffs "specific exposure to C-8 was capable of causing his testis cancer."
(Def.'s Mem. in Opp. at 6.)
Accordingly, this issue too has been rendered moot. The Court notes that to the extent either party wants to change its current positions, it must be done via motion, prior to addressing such matters before the jury.
iii. Consideration of C-8 as a Potential Cause
DuPont maintains that "Drs. Luongo and Schoenberg are not challenging *693 this Court's general causation rulings" because each "considered C-8 as a potential causal factor for Plaintiff's testicular cancer." (Def.'s Mem. in Opp. at 26.) This Court disagrees.
While the Court agrees that both experts repeatedly stated that they were instructed to assume that exposure to C-8 is capable of causing testicular cancer in humans, neither actually did so. That is, in his expert report, Dr. Luongo states that "there is no scientific proof that Mr. Freeman's specific exposure to C8 was capable of causing his testis cancer." (Luongo Report at 4.) This statement cannot logically co-exist with an assumption that there is scientific proof that Mr. Freeman's specific exposure to C-8 was capable of causing his tesits cancer.
Moreover, Dr. Luongo failed to include C-8 as a risk factor in his Report because it was not a "well-established" risk factor." (Luongo Dep. at 80-82, ECF No. 4308-2) ("I do not list [environmental exposure as a risk factor] it in my report.") Indeed, Dr. Luongo believes the data regarding C-8's ability to cause cancer as "equivocal." Id. at 84-91 ("there is no convincing nor definitive evidence that confirms any environmental agent" as a risk factor; "whether it is a true risk factor ultimately still is equivocal in my opinion"; that C-8 is capable of causing testicular cancer"is based on a single non-peer-reviewed report by a C-8 science panel and probable link report"; "there are multiple questions with respect to the findings of [the Science Panel] report"; ("there appear to be a possible probable link of C-8 with testicular cancer, but given it wasn't peer reviewed and that there's multiple questions with respect to the findings, my opinion is that its risk factor with respect to testis cancer is equivocal").
The Court recognizes DuPont's contention that Dr. Luongo does not intend to testify to some of these statements. Nonetheless, it is clear that Dr. Luongo's assessment of C-8 as a potential cause for Mr. Freeman's testicular cancer is based on his conclusion that the Science Panel's Probable Link Finding is not valid or reliable evidence. The Leach Settlement Agreement prohibits Dr. Luongo from discounting C-8 as an established risk factor in members of the Leach Class and prevents him from not accepting the Probable Link Finding as unequivocal evidence that C-8 is capable of causing testicular cancer in a Leach Class member.
Similarly, Dr. Schoenberg states in his report that "[t]he Science Panel's Probable Link Report on Cancer reports inconsistent results relating to testis cancer.... [and] there is no scientific or medical basis to conclude that Mr. Freeman's testicular teratoma was caused by his environmental exposure to PFOA." (Schoenberg Report at 1, 5.) This statement directly contradicts the Science Panel's Finding that there is scientific evidence to conclude that Mr. Freeman's cancer can be caused by his C-8 exposure. The Court clarifies that it is not saying that the Science Panel's Probable Link Finding establishes that C-8 caused Mr. Freeman's testicular cancer-just that the parties have agreed that the Science Panel's Probable Link Finding is valid and reliable scientific evidence that C-8 is capable of causing Mr. Freeman's cancer. Dr. Schoenberg must accept that evidence. Yet, Dr. Schoenberg, like Dr. Luongo, railed to even identify C-8 as a risk factor for testicular cancer in his report, testifying that it was not a well-established risk factor. The parties contractually agreed to be bound by the Science Panel's Finding, which dictates that C-8 is an established risk factor in Leach Class members.
iv. Historical State of Science Prior to Science Panel Findings
DuPont contends that Drs. Schoenberg and Luongo should be permitted to testify *694 as to the historical state of science prior to the Science Panel's findings. This Court agrees. These experts' testimony, like Dr. Rickard's, is limited to what DuPont knew over the relevant years prior to the Science Panel's Findings.
B. Specific Causation
The parties do not dispute that Dr. Luongo and Dr. Schoenberg may properly testify about Mr. Freeman's care, treatment, and prognosis. Based on his argument their opinions are unreliable, and therefore inadmissible under Rule 702 and Daubert , Mr. Freeman moves for (1) partial exclusion of Dr. Luongo's and Dr. Schoenberg's specific causation opinions and (2) exclusion of their opinions regarding tumorigenicity.
1. Specific Causation
Dr. Luongo opines that C-8 was not the cause of Mr. Freeman's testicular cancer, and instead "[i]t is not clear what caused Mr. Freeman's testis cancer.... [and that] it is equally or more likely that his cancer was the result of one or more other unknown factors that cause the disease in the vast majority of cases" and not his exposure to C-8. (Luongo Report at 3-4.) Dr. Schoenberg "conclude[s] that there is no scientific or medical basis to conclude that Mr. Freeman's testicular teratoma was caused by his environmental exposure to PFOA." (Schoenberg Report at 1.) Dr. Schoenberg testified that "more likely it is a non-C-8 factor" that caused "Mr. Freeman's testis cancer, such as the ones of genetic causes, DNA mismatch repair, in utero exposure, estrogen exposure, et cetera, and any other unknown causes that we haven't as of yet defined or found." See Luongo Depo. at 217:14-20, 68-69 (testifying that "to the extent we understand the biology of his tumor, with changes that occurred in utero long before his exposure to C-8, and that C-8 is unlikely to have been the cause of his particular tumor"). Mr. Freeman moves for exclusion of these specific causation opinions because Drs. Luongo and Schoenberg failed to reach their conclusion through use of a differential diagnosis.
In response, DuPont does not argue that either Dr. Luongo or Dr. Schoenberg engaged in a differential diagnosis, but rather contends that Mr. Freeman's Motion Regarding Specific Causation is "largely based on a false premise that DuPont's causation experts must prove a specific alternative cause of Plaintiff's testicular cancer through a differential etiology methodology." (Def.'s Mem. in Opp. at 9.) DuPont maintains that:
Plaintiffs position directly contradicts this Court's prior rulings, is legally incorrect, and attempts to improperly shift the burden of proof. As this Court recognized in Dispositive Motions Order No. 5 [ECF No. 4113] ("DMO No. 5"), "there is no dispute that as part of their cases-in-chief Trial Plaintiffs must prove that C-8 specifically caused their Linked Diseases." See DMO No. 5 at 5. This Court further recognized in the Bartlett case that DuPont is not required to prove through expert testimony or otherwise a probable alternative explanation for a plaintiff's Probable Link disease in order to defeat a plaintiff's causation case. See Sept. 14, 2015 Trial Tr. [Bartlett ECF No. 147] at 10:24-15:6.
Id. at 10.
In his reply brief, Mr. Freeman explains that DuPont's focus misses the mark:
Mr. Freeman does not argue in his Motion that DuPont must prove a specific alternative cause of his testicular cancer, rather Mr. Freeman's argument is that if DuPont chooses to offer testimony of an alternative cause for Mr. Freeman's testicular, which, as set forth below, Plaintiff submits DuPont's experts have *695 done, then, pursuant to Daubert and its progeny, DuPont's experts must utilize a reliable methodology in setting forth such opinions.
(Pl.'s Reply in Support of Mot. Regarding Specific Causation at 3.) This Court agrees.
First, the Court agrees with Mr. Freeman that he makes no argument that DuPont must prove a specific alternative cause for his testicular cancer. Rather, Mr. Freeman, as he contends, argues in his Motion that, if DuPont's experts offer an opinion as to what specifically caused Mr. Freeman's testicular cancer, that opinion must employ a reliable methodology.
Second, DuPont's assessment of this Court's prior rulings is inaccurate. That is, DuPont posits:
Plaintiff's request to exclude opinions of Drs. Luongo and Schoenberg should be denied because it is based on the fallacy that, as defense rebuttal experts, they must meet the same admissibility standard that applies to an expert who has the evidentiary burden to put forward a probable alternative cause."
In short, Drs. Luongo and Schoenberg are offering proper rebuttal opinions; thus, their opinions are not required to meet the same admissibility standards relevant to Dr. Bahnson, the expert charged with meeting Plaintiffs burden of proof and burden of persuasion on specific causation."
Id. at 25, 26 (emphasis added). This Court has never held that defense rebuttal experts offering specific causation opinions need not meet the same admissibility standard that applies to an expert who testifies in support of the party who has the burden of proof. Indeed, that is a misstatement of the law. Daubert and Evidence Rule 702 require that a trial judge "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert , 509 U.S. at 589, 113 S.Ct. 2786 (emphasis added).
DuPont's assessment confuses the burden of proof analysis with the admissibility analysis. By way of explanation, the Court refers to the same portion of the Bartlett trial relied upon by DuPont. In the Bartlett case the Court excluded DuPont's specific causation expert's alternative causation opinion because he failed to reach his conclusion utilizing a reliable methodology. The Court explained that even though DuPont had no admissible expert opinion as to the specific cause of Mrs. Bartlett's cancer, it could still successfully rebut Mrs. Bartlett's expert's specific causation opinion. The Court explained that because it is the plaintiff's burden to prove her claim, Mrs. Bartlett was required to offer admissible expert testimony as to the specific cause of her cancer. DuPont need only rebut that testimony. The Court analogized the causation assessment to a bocce ball game:
How many of you have ever seen a bocce ball game? Okay. So if you think of causation as being like somewhere on a ramp and the plaintiffs roll a ball that goes into that zone, to prevail, they have to convince the jury there's causation, specific causation in this case not general. The defense side, you don't have that burden. So you can throw -- I always call it a bocce ball. You don't care where your ball ends up as long as you knock out the ball that the plaintiffs put into the proximate cause zone ... would at least create a triable issue as to whether the plaintiff's case proved causation.
Id. at 13:20-14:9. This explanation does not stand for the proposition, as DuPont asserts, that "defense rebuttal experts offering specific causation opinions need not meet the same admissibility standard that applies to an expert who has the evidentiary burden to put forward a probable alternative *696 cause." Rather, it simply explains the burdens of proof at play in a personal injury case. The defendant's expert need not give an alternate causal factor within a reasonable degree of medical certainty. But, the testimony must still be based upon reliable science, as required by Daubert .
Third, DuPont's assessment of its experts' opinions confirms that it intends to offer affirmative causation opinions. DuPont states:
[P]ursuant to the Court's prior rulings, and as demonstrated by the applicable case law, DuPont's specific causation experts had no obligation to use a differential etiology methodology or the burden of proving that a specific "something else" probably caused Plaintiffs testicular cancer. Under the applicable law, these experts are permitted to impeach Dr. Bahnson's opinions at trial with rebuttal opinions, including, but not limited to, testimony that it is impossible to determine the more likely than not cause of Plaintiff's testicular cancer, and it is just as likely that any one of a number of other causes (known or unknown) led to its development .See Sept. 14, 2015 Trial Tr. [Bartlett ECF No. 147] at 10:24-15:6; see also infra Part IV.C.2; see also DMO No. 1-A [ECF No. 3972] at 6.
Id. at 11-12 (emphasis added). The emphasized portion of DuPont's statement describes affirmative opinions of causation. Affirmative opinions of causation must be valid and reliable to be admitted. Daubert , 509 U.S. at 589, 113 S.Ct. 2786 ; Fed. R. Evid. 702.
Mr. Freeman correctly expresses the proper delineation of these experts' testimony:
To the extent that DuPont's "causation" expert simply intends to opine that it is impossible to determine the cause of Mr. Freeman's cancer, but not offer testimony that any specific potential cause is more likely than not the cause of Mr. Freeman's testicular cancer, then Mr. Freeman does not dispute that DuPont's experts can provide such testimony. Fritch v. Univ. of Toledo College of Med. , 2011-Ohio-4518, 2011 Ohio App. LEXIS 3735 at *20 (Ohio Ct. App. Franklin County, Sept. 8, 2011). In other words, Mr. Freeman does not dispute that either Dr. Luongo or Dr. Schoenberg can opine that it is impossible to determine the cause of Mr. Freeman's testicular cancer as a rebuttal opinion to Dr. Bahnson's opinion that his testicular cancer was C-8 induced, but Mr. Freeman objects to either expert proffering affirmative opinions that his testicular cancer was more likely than not idiopathic and/or more likely than not the result of any other specific alternative cause.
(Pl.'s Reply in Support of Mot. Regarding Specific Causation at 4) (emphasis added).
Mr. Freeman properly objects to the proposed causation opinions based on their unreliability. Specifically, Mr. Freeman contends that each expert offers an affirmative causation opinion that was not reached utilizing a proper differential diagnosis. With regard to specific causation expert opinions, the Sixth Circuit explains:
This circuit has recognized differential diagnosis as an "appropriate method for making a determination of causation for an individual instance of disease." Hardyman v. Norfolk & W. Ry. Co. , 243 F.3d 255, 260 (6th Cir. 2001) ; see also Best [v. Lowe's Home Centers, Inc. ], 563 F.3d [171,] 178 [ (6th Cir. 2009) ] (stating that a causation opinion based upon a reliable differential diagnosis may satisfy the requirements of Rule 702 ). Differential diagnosis is "a standard scientific technique of identifying the cause of a medical problem by eliminating the likely *697 causes until the most probable one is isolated." Hardyman , 243 F.3d at 260 (internal quotation marks omitted). As we explained in Best , a physician who applies differential diagnosis to determine causation "considers all relevant potential causes of the symptoms and men eliminates alternative causes based on a physical examination, clinical tests, and a thorough case history." 563 F.3d at 178 (internal quotation marks omitted).
Pluck v. BP Oil Pipeline Co. , 640 F.3d 671, 678 (6th Cir. 2011).
Calling something a 'differential diagnosis' or 'differential etiology' does not by itself answer the reliability question but prompts three more:
(1) Did the expert make an accurate diagnosis of the nature of the disease? (2) Did the expert reliably rule in the possible causes of it? (3) Did the expert reliably rule out the rejected causes? If the court answers "no" to any of these questions, the court must exclude the ultimate conclusion reached.
Id. (quoting Tamraz v. Lincoln Elec. Co. , 620 F.3d 665, 674 (6th Cir. 2010) ).
As stated above, DuPont admits that neither Dr. Luongo nor Dr. Schoenberg employed a differential etiology to reach their causation opinions. (Def.'s Mem. in Opp. at 24) ("Dr. Luongo did not employ a differential etiology (and was not required to employ a differential etiology) to rebut Dr. Bahnson's analysis and opinions"; Dr. Schoenberg did not employ a differential etiology in his expert report (nor was he required to) to rebut Dr. Bahnson's analysis and conclusions."). DuPont, however, offers no reliable methodology employed by Dr. Schoenberg to reach his opinion that "more likely it is a non-C-8 factor" that caused "Mr. Freeman's testis cancer, such as the ones of genetic causes, DNA mismatch repair, in utero exposure, estrogen exposure, et cetera, and any other unknown causes that we haven't as of yet defined or found." Nor is any method offered regarding how Dr. Luongo reached his opinion that it is "equally or more likely that [Mr. Freeman's testicular] his cancer was the result of one or more other unknown factors that cause the disease in the vast majority of cases" and not his exposure to C-8. DuPont has not met its burden of demonstrating that the specific causation opinions of Drs. Luongo and Schoenberg are admissible under Daubert and Rule 702. Consequently, neither Dr. Luongo nor Dr. Schoenberg may offer any affirmative opinion as to the cause of Mr. Freeman's testicular cancer.
2. Tumerigenicity
Dr. Luongo and Dr. Schoenberg both opine that Mr. Freeman's testicular cancer is a slow growing cancer. Mr. Freeman moves for exclusion of these opinions as unreliable under Daubert and Rule 702. Mr. Freeman argues that "[d]espite the numerous pieces of medical literature cited by Dr. Luongo and Dr. Schoenberg, which contain authority showing that non-seminomatous germ cell tumors and the teratoma subtype of those tumors are rapidly growing tumors, DuPont's case-specific causation experts attempt to rely upon their 'clinical experience' to argue the opposite." (Pl.'s Mot. Regarding Specific Causation at 16.) Thus, Mr. Freeman concludes that "these experts' opinions concerning the growth rate of Mr. Freeman's teratoma are unreliable, because they are contrary to what is generally-accepted in the medical community, are contrary even to the authoritative sources relied on by these experts in their own expert reports." (Pl.'s Reply in Support of his Mot. Regarding Specific Causation at 9.) Further, Mr. Freeman argues that "Dr. Schoenberg has essentially no clinical experience with testicular growth rate." (Pl.'s Mot. Regarding *698 Specific Causation at 18); (Pl.'s Reply in Support of his Mot. Regarding Specific Causation at 9) (stating that "with respect to Dr. Schoenberg, his 'clinical experience' with testicular cancer is so de minimus that any opinions he might offer with respect to teratoma growth rates, based solely on his clinical experience, would be rank speculation").
DuPont responds:
Plaintiffs argument-premised on the assumption that DuPont's experts lack sufficient qualifications or evidence to reach a conclusion that Plaintiff's tumor was likely slow growing (which directly rebuts Dr. Bahnson's opinion that it was fast growing)-presents, at most, credibility and weight-of-the-evidence determinations that should be left for the jury.
(Def.'s Mem. in Opp. at 30.) This Court agrees.
This Court's gatekeeping function "is not intended to supplant the adversary system or the role of the jury," including "vigorous cross-examination" and "presentation of contrary evidence." Daubert , 509 U.S. at 596, 113 S.Ct. 2786 ; In re Scrap Metal Antitrust Litig. , 527 F.3d at 531-32. Mr. Freeman's arguments go to the weight to be given the tumerigenicity opinions of Drs. Luongo and Schoenberg, not their admissibility. Id.
IV.
In accordance with this Opinion and Order, the Court GRANTS IN PART AND DENIES IN PART Mr. Freeman's Motion Regarding General Causation (ECF No. 4322) and his Motion Regarding Specific Causation (ECF No. 4323).
IT IS SO ORDERED.