*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JILL POWELL-MURPHY, also known as JILL
POWELL, also known as JILL MURPHY, GAIL
BANOVIC, BONITA NORFLEET, DEMETRIOUS
KENNERLY, SHARON ROANE, and MIROSLAW
FIETKO, also known as MIKE FIETKO,

        Plaintiffs-Appellants,

v

REVITALIZING AUTO COMMUNITIES
ENVIRONMENTAL RESPONSE TRUST and
RACER PROPERTIES, LLC,

        Defendants-Appellees.

FOR PUBLICATION
August 13, 2020
9:05 a.m.

No. 348690
Oakland Circuit Court
LC No. 2018-168037-NO

Before: RONAYNE KRAUSE, P.J., and SAWYER and BOONSTRA, JJ.

BOONSTRA, J.

        Plaintiffs appeal by right the trial court's order granting summary disposition in favor of defendants under MCR 2.116(C)(10). We reverse and remand for further proceedings.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

        Plaintiffs filed this putative class action on behalf of workers at the United States Postal Service (USPS) Metroplex Processing and Distribution Center in Pontiac, Michigan (the Metroplex facility). Plaintiffs alleged negligence and public nuisance, claiming that they had suffered various physical ailments as a result of exposure to toxic chemicals including methane gas and volatile organic compounds (VOCs) while working at the facility.

        The property on which the Metroplex facility was built was previously used by General Motors Corporation as a foundry, for manufacturing operations, and for the storage of hazardous materials. In 2004, General Motors leased the property to the USPS, which built the Metroplex facility on the property. The Metroplex facility opened for operations in 2008. The lease between General Motors and USPS is governed by a Master Agreement, under which General Motors retained responsibility for cleaning up, monitoring, and remediating environmental contamination

-1-

on the property, which included known and unknown environmental conditions that existed at the time the Master Agreement was executed. General Motors retained an access easement over the property to conduct environmental cleanup and remediation. After General Motors filed for bankruptcy in 2009, Motors Liquidation Company became the owner of the property and was to handle any existing and prior environmental liability claims. In 2011, the United States Bankruptcy Court established the Revitalizing Auto Communities Environmental Response Trust (defendant RACER Trust) in an effort to remediate properties formerly owned by General Motors that had environmental contamination. The Motors Liquidation Trust quitclaimed all rights and interest in the property to defendant RACER Properties, LLC, a subsidiary of the RACER Trust.

Plaintiffs alleged that the Metroplex facility was built on land containing pools filled with Light Non-Aqueous Phase Liquid (LNAPL). According to plaintiffs, such liquids do not absorb into the water below, and anaerobic decomposition of the LNAPLs results in the generation of methane and other toxic gasses. Petroleum-based LNAPLs may include gasoline, benzene, and toluene, which are themselves also toxic.[1] Plaintiffs maintain that they have been exposed to hazardous levels of methane and other toxic gasses at the Metroplex facility since August 2015, causing a variety of physical symptoms.

According to plaintiffs, defendants negligently allowed methane gas and other toxic chemicals to build up on the property and "knew or should have known that extremely hazardous toxic chemicals were being produced, released, and discharged under their former operations," but did not use available technology and knowledge to prevent the release and discharge of the toxins. Plaintiffs also alleged that the release of toxic chemicals into the Metroplex facility amounted to a public nuisance.

On November 03, 2018, the trial court entered an initial scheduling order providing a discovery cutoff date of May 24, 2019. On November 30, 2018, the parties stipulated to the entry of an amended scheduling order providing that discovery for class certification purposes would be completed by September 13, 2019, with non-class-certification discovery completed by August 31, 2020 and dispositive motions to be filed by September 30, 2020. On December 28, 2018, lieu of answering the complaint, defendants moved for summary disposition under MCR 2.116(C)(10), arguing that they did not owe a duty of care to plaintiffs, and that plaintiffs could not establish that defendants were the cause of plaintiffs' alleged injuries. Plaintiffs responded on March 6, 2019, arguing that discovery had not yet been completed and that, under the terms of the stipulated scheduling order, discovery for class-action certification was to precede discovery on the substantive merits of plaintiffs' claims, rendering defendants' motion premature. They also argued that in any event they had presented sufficient evidence of defendants' duty of care and causation to withstand summary disposition. Plaintiffs also requested that, if the trial court found their complaint to be insufficiently detailed, they should be permitted to amend their complaint, and they attached a proposed amended complaint.

---

[1] See, e.g., < https://www.epa.gov/sites/production/files/2015-06/documents/lnapl.pdf > and < https://www.michigan.gov/documents/deq/deq-rrd-NAPLResourceDocument_464472_7.pdf >.

The trial court held a hearing on defendants' motion on March 20, 2019. On April 11, 2019, the trial court issued a written opinion and order granting defendants' motion for summary disposition, concluding that defendants were not responsible for the air conditions in the Metroplex facility and that plaintiffs had not presented evidence of causation to avoid summary disposition.

This appeal followed.

## II. STANDARD OF REVIEW

This Court reviews de novo a trial court's decision on a motion for summary disposition. See *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). The trial court in this case granted summary disposition in favor of defendants under MCR 2.116(C)(10).

> A motion under MCR 2.116(C)(10) . . . tests the factual sufficiency of a claim. *Johnson v VanderKooi*, 502 Mich 751, 761; 918 NW2d 785 (2018). When considering such a motion, a trial court must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion. *Id*. A motion under MCR 2.116(C)(10) may only be granted when there is no genuine issue of material fact. *Lowrey v LMPS & LMPJ, Inc*, 500 Mich 1, 5; 890 NW2d 344 (2016). "A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ." *Johnson*, 502 Mich at 761 (quotation marks, citation, and brackets omitted in original). [See *El-Khalil*, 504 Mich at 160.]

Whether a defendant owed a duty of care to a plaintiff is a question of law that we review de novo. *Riddle v McLouth Steel Prod Corp*, 440 Mich 85, 95; 485 NW2d 676 (1992).

## III. DUTY OF CARE

Plaintiffs argue that the trial court erred by determining that defendants owed no duty of care to plaintiffs regarding exposure to environmental contaminants. We agree.

To establish a prima facie case of negligence, a plaintiff must satisfy the following elements:

> [T]he defendant owed the plaintiff a legal duty, (2) the defendant breached the legal duty, (3) the plaintiff suffered damages, and (4) the defendant's breach was a proximate cause of the plaintiff's damages. [*Hill v Sears, Roebuck & Co*, 492 Mich 651, 660; 822 NW2d 190 (2012).]

A duty of care may be one that the defendant owes specifically to the plaintiff, or it may be one that the defendant owes to the general public of which the plaintiff is a member. *Clark v Dalman*, 379 Mich 251, 261; 150 NW2d 755 (1967), impliedly overruled on other grounds by *Fultz v Union-Commerce Assoc*, 470 Mich 460; 683 NW2d 587 (2004). While one person generally does not have an obligation to help or protect another, a duty of care may arise by way of statute, a contractual relationship, or the common law. *Hill*, 492 Mich at 661; *Clark*, 379 Mich at 261. The common law imposes a duty on "every person engaged in the prosecution of any undertaking an obligation to use due care, or to so govern his actions as not to unreasonably endanger the person or property of others." *Id*.

-3-

The Master Agreement also explicitly states that the property was subject to a Performance Based Corrective Action Agreement between the United States Environmental Protection Agency and General Motors regarding the remediation of environmental conditions on the property. The Master Agreement places the responsibility on General Motors (and thus, by assignment, on defendants) to "undertake cleanup, remediation, investigation, sampling, monitoring, inspection, evaluation, construction, installation, operation and maintenance of any remedial systems installed at, in, or on the Property, or other actions" required to remediate "Environmental Conditions" on the property, known or unknown, which existed or was caused by operations on the property prior to its lease to USPS. The Master Agreement's definition of "Environmental Conditions" includes "[A]ny contamination in, at, or of the soils, surface waters, or groundwater at the Property, including any abandoned underground storage tanks or any discrete containers which may contain or formerly contained chemicals or waste materials." The Master Agreement also gives General Motors the right to access the property in order to complete any necessary remediation efforts. As stated, plaintiffs have alleged that they were injured by contamination of the soil of the property by LNAPLs, which broke down into methane and other toxic gasses. Under these circumstances, the terms of the Master Agreement support our conclusion that defendants owe a duty of care to those injured by environmental conditions on the property.

Defendants argue that section 2.k. of the Master Agreement places the responsibility for the "working conditions" in the facility on USPS, and that any exposure to methane was therefore USPS's responsibility. In that regard, the trial court held, "[a]s an initial matter, Plaintiffs have failed to establish how Defendants are responsible for the working conditions in a building, constructed and operated by their employer, the USPS." We disagree and find defendants' argument unpersuasive in light of the text of that provision:

> USPS Construction. From and after the Commencement Date, and except as provided in this Agreement, USPS shall be solely responsible for all conditions of the Property (*except for the Environmental Condition as described herein*), including, without limitation, the control of dust on the Property, air monitoring, storm water pollution prevention plan implementation, management of waste materials, erosion control, traffic requirements, and all matters set forth in the Ground Lease. . . . [Emphasis added.]

The provision clearly carves out an exception for preexisting environmental conditions on the property. We conclude that the trial court erred to the extent it determined that defendants owed no duty of care to plaintiffs. *Hill*, 492 Mich at 661; *Clark*, 379 Mich at 261.

## IV. CAUSATION

Plaintiffs also argue that the trial court erred by granting summary disposition in favor of defendants on the issue of causation. We agree that the trial court acted prematurely in doing so.

The causation element of a negligence claim encompasses both factual cause (cause-in-fact) and proximate, or legal, cause. See *Skinner v Square D Co*, 445 Mich 153, 163; 516 NW2d 475 (1994). Factual cause "generally requires showing that 'but for' the defendant's actions, the plaintiff's injury would not have occurred." *Id.* (citation omitted). Proximate cause, by contrast, "normally involves examining the foreseeability of consequences, and whether a defendant should

be held legally responsible for such consequences. *Id.* (citations omitted). A plaintiff must necessarily establish factual cause in order to establish proximate cause. *Id.* While factual causation may be established with circumstantial evidence, the evidence must support "reasonable inferences of causation, not mere speculation." *Id*. at 164. The *Skinner* Court explained that to provide circumstantial evidence that permits a reasonable inference of causation, a plaintiff "must present substantial evidence from which a jury may conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred." *Id.* at 165. The mere possibility of causation is insufficient to survive summary disposition. *Id.* at 166.

In a "toxic tort" case such as this, the causation issue is complicated by the further consideration of both "general causation" and "specific causation." Indeed, the trial court appeared to recognize this, as it held that "Plaintiffs have not established general or specific causation linking any particular constituent to any alleged injury."

There is no binding caselaw in Michigan on this subject, however. Consequently, to provide guidance to the trial court and the parties on remand, as well as future "toxic tort" litigants and courts, we take this opportunity to address the issue.[2]

## A. GENERAL AND SPECIFIC CAUSATION

In *Lowery v Enbridge Energy Ltd Partnership*, unpublished per curiam opinion of the Court of Appeals, issued April 2, 2015 (Docket No. 319199), p 1, the plaintiff, who lived near the Kalamazoo River, alleged that he had suffered injuries after an oil spill into the Talmadge Creek and the Kalamazoo River had exposed him to toxic fumes. *Id*. After the spill, the plaintiff began to have migraine headaches and experienced vomiting and severe abdominal pain that ultimately required his hospitalization. *Id*. Subsequent testing revealed that the plaintiff had experienced an avulsion of his short gastric artery that caused internal bleeding. *Id*. The *Lowery* Court considered the opinion of the plaintiff's medical expert in addressing whether the plaintiff had established a prima facie case of negligence:

> Plaintiff's medical expert reviewed plaintiff's hospital records and concluded that oil fumes caused plaintiff's headaches, nausea, coughing, and vomiting, and that "the tear in his short gastric artery was caused by violent and uncontrollable bouts of coughing and vomiting which resulted in changes in intra-abdominal pressure and sudden and violent movement of the upper intra-abdominal organs . . . ." The expert did not examine plaintiff, basing his opinion solely on a review of the medical records. [*Id* at 1-2.]

---

[2] The parties appear to agree that in a "toxic tort" case such as this, both "general causation" and "specific causation" must be proven. Where they part company is with regard to the type or level of causation that must be shown at the summary disposition stage of the litigation. Plaintiffs maintain that they need only provide a showing of "general causation" to survive summary disposition; defendants argue that plaintiffs must provide a showing of both "general causation" and "specific causation."

The Court concluded that the plaintiff had presented sufficient evidence of causation to withstand summary disposition under MCR 2.116(C)(10), explaining:

> A plaintiff is permitted to prove his case through circumstantial evidence and reasonable inferences. Here, there was a strong enough logical sequence of cause and effect for a jury to reasonably conclude that [the] plaintiff's exposure to oil fumes caused his vomiting, which ultimately caused his short gastric artery to rupture. Plaintiff lived in the vicinity of the oil spill and was aware of an overpowering odor and was aware that "the news just kept saying that headaches and nausea [sic]." A reasonable reading of plaintiff's testimony is that he had an approximately weeklong spell of severe migraines that started the day after the spill and then, approximately a week after that, he experienced a several-days-long bout of vomiting. During a fit of vomiting, plaintiff felt a sharp pain in his abdomen, and it turned out that his short gastric artery (which runs between the stomach and the spleen) had ruptured, requiring surgery. Given the proffered evidence, the claim that the already-adjudged negligence of defendants in the release of oil into the Kalamazoo River caused the artery rupture goes beyond mere speculation. [*Id*. at 3.]

Our Michigan Supreme Court granted leave to appeal to consider whether the plaintiff had sufficiently established causation to avoid summary disposition under MCR 2.116(C)(10), and whether the plaintiff was required to present expert witness testimony regarding general and specific causation. See *Lowery v Enbridge Energy Ltd Partnership*, 499 Mich 886; 876 NW2d 567 (2016). Ultimately, however, the Court issued a short-form order that addressed only the first of those issues, concluding that the plaintiff had failed to show a genuine dispute of material fact regarding causation. It concluded that plaintiff's expert had engaged in mere speculation or conjecture, employing *post hoc* reasoning to conclude that the defendants' oil spill was the cause in fact of the plaintiff's injury merely by virtue of the fact that the plaintiff had problems after, but not before, the oil spill. *Lowery v Enbridge Energy Ltd Partnership*, 500 Mich 1034; 898 NW2d 906 (2017).

Then-Chief Justice MARKMAN, in a concurring opinion joined by Justices ZAHRA and WILDER, wrote separately "to provide counsel to the bench and bar concerning toxic tort litigation." We now adopt the rationale articulated by Justice MARKMAN in his concurring opinion in *Lowery* as the appropriate analytical framework.

Justice MARKMAN, in his concurring opinion, noted that the Supreme Court's order did not decide the applicability of the general/specific causation framework to the issue of factual causation. *Lowery*, 500 Mich at 1035 (MARKMAN, C.J., concurring). Because, he said, "uncertainty continues to characterize [Michigan's] toxic tort jurisprudence[,]" even while most jurisdictions had adopted the general/specific causation framework in toxic-tort cases, Justice MARKMAN sought to provide "some semblance of guidance" to litigants in toxic-tort cases, as well as to the lower courts deciding and reviewing the cases. *Id*. (MARKMAN, C.J., concurring). He stated:

> I agree with the vast majority of other jurisdictions that the general-and-specific-causation framework may be utilized to analyze the cause-in-fact element of a toxic

tort claim. At a minimum, this framework should apply when a plaintiff seeks to prove factual causation employing group-based statistical evidence. [*Id*. at 1036 (MARKMAN, C.J., concurring).]

Justice MARKMAN acknowledged that "[t]he great majority of jurisdictions have bifurcated the cause-in-fact element in toxic tort cases into separate and distinctive analyses of 'general causation' and 'specific causation.'" *Id*. at 1036 (MARKMAN, C.J., concurring). Additionally, secondary literature supported the use of the framework. *Id*. Justice MARKMAN further explained the concepts of general and specific causation:

> General causation pertains to whether a toxin is capable of causing the harm alleged. A necessary predicate to this inquiry is identifying the asserted exposure level of the toxin. "A number of courts have required plaintiffs to prove the level of exposure (dose) in order to establish causation." *Goeb v Tharaldson*, 615 NW2d 800, 815 (Minn, 2000). "[T]he mere existence of a toxin in the environment is insufficient to establish causation without proof that the [particular] level of exposure could cause the plaintiff's symptoms." *Pluck v BP Oil Pipeline Co*, 640 F3d 671, 679 (CA 6, 2011). Put another way, causation "requires not simply proof of exposure to the substance, but proof of enough exposure to cause the plaintiff's specific illness." *McClain v Metabolife Int'l, Inc*, 401 F3d 1233, 1242 (CA 11, 2005) [reh den 159 Fed Appx 183 (CA 11, 2005)]. [*Lowery*, 500 Mich at 1043 (MARKMAN, C.J., concurring).]

Justice MARKMAN elaborated that it is crucial that the plaintiff present evidence of the specific exposure level in determining whether the toxin caused the alleged harm, because many chemicals are safe at some levels, but toxic and harmful at different levels. *Id*. (MARKMAN, C.J., concurring). On the other hand, specific causation requires "proof that exposure to the toxin more likely than not caused *the plaintiff's* injury." *Id*. at 1044 (MARKMAN, C.J., concurring). (Emphasis in original.) To avoid leaving the jury in a position in which it is required to speculate, the plaintiff bears the onus of putting forth evidence that he or she was in fact exposed to the toxin at issue, "including the estimated amount and duration of exposure." *Id*. at 1045 (MARKMAN, C.J., concurring). If relying on circumstantial evidence, the evidence must be such that reasonable inferences can be drawn concerning the plaintiff's exposure level. *Id*. (MARKMAN, C.J., concurring). Citing *Skinner*, 445 Mich at 166, Justice MARKMAN also opined that a plaintiff, to establish specific causation, bears the onus of presenting evidence that excludes other "reasonably relevant potential causes of a plaintiff's symptoms." *Lowery*, 500 Mich at 1046 (MARKMAN, C.J., concurring).

With regard to expert testimony, Justice MARKMAN observed that the majority of jurisdictions have held that expert testimony is generally necessary, with most jurisdictions going so far as to suggest that it is indeed required. *Id*. at 1047-1048 (MARKMAN, C.J., concurring). While acknowledging that Michigan courts have not squarely addressed this question, Justice MARKMAN stated he would apply Michigan's general rule and conclude "that the need for expert testimony regarding causation in a toxic tort case is determined on the basis of whether the matter 'is so obvious that it is within the common knowledge and experience of an ordinary layperson.'" *Id*. at 1049 (MARKMAN, C.J, concurring), quoting *Elher v Misra*, 499 Mich 11, 21-22; 878 NW2d 790 (2016).

Justice MARKMAN'S concurring opinion in *Lowery* is instructive and provides meaningful guidance regarding the applicability of the general/specific causation framework in determining whether a plaintiff has presented evidence of factual causation to support a claim of negligence in a toxic-tort case, and we hereby adopt it as our own.[3]

Plaintiffs maintain that they satisfied the requirement of general causation because they presented evidence "establishing that toxic chemical emissions were present in the Metroplex[,] and that the [p]laintiffs all suffered health effects that can be attributed to those emissions." However, plaintiffs acknowledge that they have not presented evidence of the level of the toxic emissions to which they were exposed in the Metroplex facility, and whether that level was sufficient to cause the alleged health effects. In our view, this omission would render plaintiffs' proffered evidence insufficient to survive a motion for summary disposition brought at the appropriate time. We agree with Justice MARKMAN that "identifying the asserted exposure level" of the toxin or toxin at issue is necessary in determining whether the toxin or toxins at issue are even capable of causing the harm alleged. *Lowery*, 500 Mich at 1043 (MARKMAN, C.J., concurring).

While plaintiffs presented evidence showing that testing in November 2016 established that the presence of methane in parts of the Metroplex facility had become elevated since testing conducted before the facility was constructed, plaintiffs did not present any evidence of the alleged specific levels of methane or other potentially harmful toxins in or around the Metroplex facility to which plaintiffs were exposed. Without such evidence, it is not possible to determine whether the alleged exposure could have harmed plaintiffs and caused their alleged injuries. *Id*. at 1044 (MARKMAN, C.J., concurring). And although plaintiffs presented evidence that methane and other toxins, such a benzene, may have been present in the Metroplex facility, there is no information, absent some indication of the level of toxins may have been present, from which a fact-finder could determine whether any exposure could have caused plaintiffs' alleged injuries. *Id*. As Justice MARKMAN clarified, "evidence of general causation should be tailored to the estimated amount and duration of exposure at issue to enable the fact-finder to reasonably conclude that exposure to the defendant's toxin in the amount and duration alleged is capable of causing the alleged injury." *Id*. (MARKMAN, C.J., concurring.)

Accordingly, on remand, the causation analysis (after sufficient discovery) should focus on whether plaintiffs can provide specific information regarding the level of methane gas and other toxins potentially present at the Metroplex facility to which plaintiffs (and other members of the

---

[3] The approach advocated by Justice MARKMAN has been approved by federal courts, including the Sixth Circuit. See, e.g., *Pluck v BP Oil Pipeline Co*, 640 F3d 671, 676-77 (6th Cir, 2011) (stating that "[i]n a toxic-tort case . . . the plaintiff must establish both general and specific causation," and noting that general causation requires "proof that the toxic substance is capable of causing . . . the plaintiff's alleged injury" while specific causation requires "proof that the toxic substance . . . did cause[] the plaintiff's alleged injury." While the decisions of lower federal courts are not binding on this Court, they may be persuasive. *Vanderpool v Pineview Estates LC*, 289 Mich App 119, 124 n 2; 808 NW2d 227 (2010).

prospective class) were exposed, and whether exposure at that level could cause plaintiffs' symptoms.

## B. PREMATURITY

Plaintiffs argue that the trial court erred by prematurely holding, before discovery had been completed, that no genuine issue of material fact had been raised concerning causation. We agree that the trial court erred by granting summary disposition under MCR 2.116(C)(10) at such an early stage in the proceedings.

"Generally, summary disposition under MCR 2.116(C)(10) is premature if it is granted before discovery on a disputed issue is complete." *Marilyn Froling Living Revocable Living Trust v Bloomfield Hills Country Club*, 283 Mich App 264, 292; 769 NW2d 234 (2009). However, a party may not simply allege that summary disposition is premature. The party must clearly identify the disputed issue for which it asserts discovery must be conducted, and support the issue with independent evidence. *Id*. The dispositive inquiry is "whether further discovery presents a fair likelihood of uncovering factual support for the party's position." *Mazzola v Deeplands Dev Co*, ____ Mich App ___, ____; ____ NW2d ____ (Docket No. 343878) (2019); slip op at 7.

As discussed, the parties stipulated at the outset of this case to a bifurcated discovery period, during which discovery related to class-certification would take place before discovery related to plaintiffs' substantive claims. A deadline for dispositive motions was set nearly two years into the future. Yet the very next month defendants moved for summary disposition under MCR 2.116(C)(10), seeking to test the factual sufficiency of the evidence supporting plaintiffs' allegations. See *El-Khalil*, 504 Mich at 160. According to plaintiffs, defendants had not even produced documents in response to their first request for production of documents at the time of hearing, and plaintiffs were in the process of answering defendants' first request for interrogatories.

Notwithstanding the fact that discovery was still in its early stages, plaintiffs did present documentary evidence in support of many of their allegations. Plaintiffs presented ample evidence demonstrating that the property on which the Metroplex facility was built is contaminated and that LNAPLs are located on the property. Plaintiffs also presented evidence that a methane detection system at the Metroplex facility was not operating properly from March 2015 until the Office of the Inspector General (OIG) for the USPS submitted its February 22, 2016 memorandum, and that as a result of the malfunction, the Metroplex facility, according to a vendor who performed system maintenance on the methane detection system, experienced methane buildup. With regard to the presence of chemicals and gases at the Metroplex facility, a January 25, 2017 OIG report revealed that testing performed at the Metroplex facility in November 2016 confirmed that methane levels in parts of the building "exceeded the concentrations considered when the building was designed." Testing performed in 2016 detected levels of benzene (a VOC) exceeding acceptable levels established by the Michigan Department of Environmental Quality, although other tests performed in 2016 did not detect excessive levels of benzene. Plaintiffs also presented evidence that they had suffered various physical and mental ailments during the relevant time periods and provided evidence that exposure to methane and VOCs could cause these ailments.

We agree with defendants that the evidence presented by plaintiffs to date was, in itself, insufficient to prove a genuine issue of material fact regarding causation; specifically, plaintiffs did not present evidence proving the level of exposure acutely or chronically suffered by plaintiffs, or definitively establish (most likely with expert testimony, as discussed below), that the alleged exposure caused their symptoms. See *Lowery v Enbridge Energy Ltd Partnership*, 500 Mich at 1034 (2017). However, in the context of plaintiffs' claim that defendants' motion for summary disposition was premature, we conclude that they have "at least assert[ed] that a dispute does exist and support[ed] that allegation by some independent evidence." See *Bellows v Delaware McDonald's Corp*, 206 Mich App 555, 561; 522 NW2d 707 (1994). In other words, "further discovery presents a fair likelihood of uncovering factual support for the party's position." *Mazzola*, ____ Mich App at ___;slip op at 7. Our decision is bolstered by the fact that the causation analysis almost surely requires expert testimony, yet neither the class-certification nor substantive-issue deadline for naming expert witnesses had passed at the time defendant's motion was decided. See *Bayn v Dep't of Natural Resources*, 202 Mich App 66, 70-71; 507 NW2d 746 (1993) (stating that the "defendant's motion for summary disposition was granted prematurely because it was not reasonable to expect plaintiff to gather sufficient facts to withstand a motion for summary disposition within the compressed time frame allotted in this case between the filing of the complaint and the granting of the motion for summary disposition" and noting that with additional time the plaintiff's expert could have collected additional data to support her position). While we express no opinion on whether plaintiffs will ultimately prevail on any future (C)(10) motion brought after discovery, we conclude they are entitled to further discovery on the issue of causation.[4]

Reversed and remanded for reinstatement of plaintiffs' claims and for further proceedings consistent with this opinion.[5] We do not retain jurisdiction. Plaintiffs, as the prevailing parties, may tax costs. MCR 7.219(A).

/s/ Mark T. Boonstra
/s/ Amy Ronayne Krause
/s/ David H. Sawyer

---

[4] We also note that the trial court, in its dispositional order, did not address plaintiffs' request to be allowed to amend their complaint. MCR 2.116(I)(5) states that a trial court "shall give the parties an opportunity to amend their pleadings" if the grounds asserted for summary disposition are based on subrule (C)(10), unless "the evidence then before the court shows that amendment would not be justified."

[5] Given this outcome, we need not address plaintiffs' argument that the trial court failed to explicitly consider their public nuisance claim. However, we reject defendants' argument, made at oral argument, that plaintiffs waived their nuisance claim, either before the trial court or on appeal.